**CONTINENTAL CASUALTY COMPANY**
v.
**HAENN SHIP CEILING & REFITTING CORPORATION et al.**

**ATLANTIC PORT CONTRACTORS, Inc.**
v.
**CONTINENTAL CASUALTY COMPANY.**
Civ. A. Nos. 14598, 14273–74.

United States District Court
E. D. Pennsylvania.
Aug. 8, 1955.

Edward J. Mingey, Philadelphia, Pa., for Haenn Ship Ceiling.

Zink, Shinehouse & Holmes, Philadelphia, Pa., for Atlantic Port Contractors.

KIRKPATRICK, Chief Judge.

The proceedings by which the issue in this case has been arrived at are all matter of record and stipulation and need not be detailed here. Lee (who for all practical purposes was Pennsylvania Drydock & Shipbuilding Co., Inc.) was a contractor doing work on two government ships. Van Diepen (who in the same way was Atlantic Port Contractors, Inc.) was also in the ship repair business. In this action Van Diepen is seeking to recover, from Continental Casualty Co., the surety on Lee's bond, money advanced by him to Lee to meet the latter's payrolls, his position being that he, Van Diepen, is either an equitable assignee or a subrogee, or both, of the workmen whose wages were paid with the money.

There is almost no dispute about the facts. In substance, the case is as follows:

In late September, 1951, Lee was in financial difficulties. His continuance in business was a matter of concern to Van Diepen, as well as to other ship repair firms in Philadelphia, because Lee's drydock was the only one in the port of Philadelphia.

Lee, who had been hoping to obtain a loan from the finance company sufficient to carry the business and meet the payrolls for the first two weeks in October, agreed with Van Diepen that, if the latter would advance him money to meet his payroll for the last two weeks in October, he would give him a 50% interest in the drydock company together with its entire management. Lee was unable to get any money from the finance company and checks which he had issued on Friday, October 12, for the payroll due October 5 began to come back dishonored. On October 15 Van Diepen loaned him $10,000 to tide him over until other arrangements could be made.

Daniel Mungall, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Continental Casualty.

This was a straight loan and Van Diepen is not seeking to recover it from the bonding company. Lee was unsuccessful in making other arrangements, and beginning October 16 Van Diepen put up money to meet the October 5 payroll and, later on, to meet subsequent payrolls, the transaction being in substance a direct payment by him to the men. The amount of these advances is what he is now claiming from the bonding company.

Incidentally, a petition in bankruptcy had been filed against Lee's company on October 15. Receivers were appointed and took possession about October 23.

Van Diepen had been in touch with Loughney, the business manager of the union to which the workers belonged, as early as the latter part of September, and they had talked about Van Diepen's advancing money to meet payrolls. Loughney kept prodding Van Diepen in an effort to be sure that the men would be paid, and, some time prior to October 15, Van Diepen made a definite promise to Loughney that he would back Lee's payrolls in order to keep the men on the job. Of course, Lee had promised Van Diepen that he would reimburse him, but, in view of Lee's financial condition, that promise was of little value, so, when Van Diepen was unexpectedly faced with the choice between keeping the plant going or losing his $10,000, he raised the question of security with Loughney.

■ Before examining more fully the arrangement between Loughney and Van Diepen, it would be well to have in mind the applicable principles of law. Whether we approach the problem here presented from the standpoint of equitable assignment or that of subrogation makes very little difference because the doctrines are so closely akin. "The equitable doctrine of equitable assignment, 'which is a particular application of the broad principle of subrogation, is enforced whenever the person making the payments stands in such relations to the premises or to the other parties that his interests, recognized either by law or by equity, can only be fully protected and maintained by regarding the transaction as an assignment to him'", Lietka v. Hambersky, 167 Pa.Super. 304, 308, 74 A.2d 698, 700.

To determine whether either doctrine (or both) is here applicable, the entire situation must be examined and the understanding between Van Diepen and Loughney ascertained in the light of what they said, taken in connection with the existing situation and all the surrounding circumstances.

■ It is quite true that the conversation between the two men did not include an express assurance by Loughney that he would procure assignments from the workmen of their claims. It may be assumed that a ship repair contractor and a labor union representative would not be familiar with the terminology of the law of equitable assignments. However, what Loughney promised, in substance, was that he would do everything he could to see that Van Diepen would get his money back. Van Diepen testified that Loughney said "if you take care of it I will see that you are taken care of right away, that we get the security for you that you have paid the men *whatever you need*", and Loughney's testimony was in substantial accord. Both, of course, knew that Lee had given a bond and, in the conversation quoted from, Loughney said, "You know, Van, the men can wait three or four or five weeks and get their money from the bonding people, but the people who work for you or anyone along the waterfront, they need their money to buy groceries, they want it right away." It takes no strained interpretation to find that, when Loughney promised to get Van Diepen "the security * * * that you have paid the men whatever you need", he meant that he would see that Van Diepen would be put in the same position as the men by whatever legal steps were necessary, including assignments, and that it was so understood by Van Diepen.

There is no question about the authority of Loughney to make the engagement

for the men, and, if there were, the fact that a very large proportion of the men subsequently ratified the promise by actually executing written assignments would settle it.

Apart from any question of Loughney's agreement, to obtain assignments, I am of the opinion that Van Diepen's claim could be properly allowed on principles of subrogation. "I regard the doctrine (subrogation) as applicable in all cases, where a paymant has been made under a legitimate and fair effort to protect the ascertained interests of the party paying, and when intervening rights are not legally jeopardized or defeated." Mosier's Appeal, 56 Pa. 76, 81. Of course, there are many cases in which the courts have refused to apply the doctrine in favor of "volunteers", "strangers" or "intermeddlers", but Van Diepen cannot possibly be so described. He had a very definite interest which could only be protected by taking up Lee's dishonored checks and meeting his payroll. In the first place, he had the general interest that ship repair men in Philadelphia had in keeping the drydock in operation. Then, Lee had promised him a half interest and the entire management, and he had already invested $10,000 by way of a loan. And, in addition, he had bound himself by a definite promise to Loughney to see that the men were paid —a promise which he could not have very well repudiated without serious indirect consequences to his own business.

" * * * recognition by courts of equity of assignments invalid at law is based fundamentally upon principles of natural justice and essential fairness." 6 C.J.S., Assignments, § 58, p. 1103. In this case the surety was relieved by Van Diepen of what was an imminent liability and no considerations of equity demand that it be protected from Van Diepen's claim for reimbursement.

Judgment may be entered in favor of Atlantic Port Contractors, Inc. The amount is easily ascertainable and counsel may present an order.